**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA**

Case No. 1:14-cv-21242-KMM

PALM PARTNERS, LLC,
a Florida Limited Liability Company,

       Plaintiff,

v.

CITY OF OAKLAND PARK,
a Florida municipal corporation,

       Defendant.

_____/

**ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

      THIS CAUSE came before the Court upon Defendant City of Oakland Park's Motion for

Summary Judgment (the "Motion") (ECF No. 73).  Plaintiff Palm Partners, LLC filed a

Response in Opposition to City of Oakland Park's Motion for Summary Judgment (the

"Response") (ECF No. 81), and Defendant City of Oakland Park filed a Reply in Support of

Motion for Summary Judgment (the "Reply") (ECF No. 102).  The Motion is now ripe for

review.

      For the reasons set forth below, Defendant City of Oakland Park's Motion for Summary

Judgment is GRANTED.

**I.      BACKGROUND**

      Palm Partners, LLC ("Palm Partners") provides behavioral and mental health treatment

services to people with disabilities.  Compl. ¶ 6 (ECF No. 1).  Together with its affiliates, Palm

Partners owns and operates three treatment facilities in the State of Florida.  Id.  The City of

Oakland Park (the "City") is located in Broward County, Florida.

### A.      The Property

On May 3, 2013, Palm Partners entered into a contract to purchase a combined 12.85 acres in the City (the "Property").  Def.'s Statement of Undisputed Material Facts in Support of Summ. J. ("Def.'s SOF") ¶ 1 (ECF No. 74); Pl.'s Resp. to Def.'s Statement of Undisputed Material Facts in Support of Summ. J. ("Pl.'s SOF") ¶ 1 (ECF No. 82).  The Property is surrounded by a vacant lot and land zoned for single-family residential use to the north, medical offices to the south, land zoned for single-family residential (future commercial) use to the west, and a railway and an industrial warehouse to the east.  See App. of Pl.'s Resp. in Opp'n to Def.'s Mot. for Summary J. ("Pl. App.") Ex. 0101 (ECF No. 96).  Up and until 2008, the Property was developed as the North Ridge Medical Center, a 396-bed acute care general hospital.  Def.'s SOF ¶ 2.  The Property, located in an area zoned for "Community Facilities" use, bears a Community Facilities zoning designation, Def.'s SOF ¶ 3, which applies to areas "which are in the best interests of the public to be utilized for community facilities," Pl. App. Ex. 0138.

A property located in a Community Facilities zone does not have residential density to support residential use.  See Def.'s SOF ¶ 15.  Under the City's comprehensive land use plan (the "Comprehensive Plan"),[1] a property requires a certain amount of residential density before it can be developed for residential purposes.  See Motion at 4.  Residential density may be allocated to a property in one of two ways: either through a residential zoning designation, or through an alternate process that allows for the assignment of residential reserve or flexibility units to the property at a density sufficient to support the proposed residential use.  See Def.'s SOF ¶ 14.  The City's Unified Flex Zone Map identifies specific properties that are eligible to

---

[1] The Comprehensive Plan is the City's operative land use and zoning document.  All development undertaken, and all actions taken in regard to development orders by the City, must be consistent with the Plan.

receive residential reserve or flexibility units (i.e., "receiving sites") and specific properties that are not eligible to receive such units (i.e., "non-receiving sites").  Id. ¶ 16.  If a property is ineligible to receive residential density through either means, the City's Comprehensive Plan or Unified Flex Zone Map must be amended to change the property's zoning designation or demarcate it as a receiving site.  See id. ¶¶ 14–17.

Because the Property is a non-receiving site zoned for Community Facilities use, the Property cannot receive residential density without amendment to the City's Comprehensive Plan or Unified Flex Zone Map.  See id.

**B.      Palm Partners Applies for Conditional Use of the Property**

On November 21, 2013, Palm Partners submitted a conditional use application to develop the Property as a hospital.  Pl.'s Statement of Additional Material Facts ("Pl.'s SOAF") ¶ 1 (ECF No. 82); Def.'s SOF ¶ 4.  The proposed facility, called the Northridge Behavioral Health Center, would offer behavioral and mental health services like substance abuse treatment, detoxification, and trauma resolution.  Compl. ¶¶ 12–15.  The application sought approval for up to 300 beds, with patients residing at the facility for thirty to ninety days, although a few residential-style apartments would be available for patients interested in staying longer.  Id. ¶¶ 14, 34.  On the application, Palm Partners stated that it intended to use the Property as a "hospital."  See Def.'s App. in Support of Mot. for Summ. J. ("Def.'s App.") 2 (ECF No. 75).

**C.      City Staff Recommends Approval of Palm Partners' Conditional Use Application**

Palm Partners' conditional use application was subject to a two-step review process. Initially, City staff, comprising representatives from various City departments and agencies, reviewed the application to facilitate consideration by the City Planning and Zoning Board and City Commission (the "City Commission" or "Commission").  Def.'s SOF ¶ 5.  Based on Palm

Partners' representations, City staff analyzed the application for use of the Property as a hospital

only, concluding that Palm Partners' proposed use satisfied the requirements for conditional use

as a hospital.  Def.'s SOF ¶ 6.  City staff prepared an agenda item report for the City

Commission recommending approval of the application.  See Pl.'s SOF ¶ 6; Def.'s SOF ¶ 6.

### D.   The City Commission Holds Public Hearings on Palm Partners' Conditional Use Application

The City Commission held two public hearings on Palm Partners' conditional use

application, the first on February 19, 2014, and the second on March 5, 2014.  Pl.'s SOF ¶ 7;

Def.'s SOF ¶ 7.  The Commission, made up of five city commissioners elected to four-year

terms, is responsible for, among other things, reviewing and acting on zoning applications,

including those for conditional use approval.  Def.'s SOF ¶ 19.

The Commission was aware that the application specified that Palm Partners intended to

use the Property as a hospital.  See Def.'s App. 5 ¶ 6; App. 6 ¶ 6; App. 7 ¶ 6; App. 8 ¶ 6; App. 9

¶ 6; see also Def.'s App. 12 at 44:3–18.  During the hearings, however, it became apparent to

each commissioner that Palm Partners did not intend to develop the Property as a hospital, but

rather as a residential treatment facility.  See Def.'s App. 5 ¶ 6; App. 6 ¶ 6; App. 7 ¶ 6; App. 8 ¶

6; App. 9 ¶ 6; see also App. 12 at 44:9–24.  The hearings also revealed that none of Palm

Partners' other facilities in Florida are licensed as hospitals.  See Def.'s App. 12 at 55:10–56:19.

The discrepancy between Palm Partners' applied-for use of the Property as a hospital and

its actual intended use as a residential treatment center became an area of concern for the

Commission.  See Def.'s App. 5 ¶ 6; App. 6 ¶¶ 6–7; App. 7 ¶¶ 6-7; App. 8 ¶¶ 6–7; App. 9 ¶¶ 6–

7.  The Commission pressed Palm Partners on the licenses it intended to apply for, see Def.'s

App. 5 ¶ 6; App. 7 ¶ 7; App. 8 ¶ 7; App. 9 ¶ 7, with Palm Partners conceding that the facility

would not be licensed as a hospital, see Def.'s App. 12 at 44:3–45:18.  When asked if it would

4

agree to obtain hospital licensure as a condition for approval of its application, Palm Partners

agreed only to apply for one.  <u>See</u> Def.'s App. 12 at 54:11–14.  In response to this concession,

one commissioner remarked:  "[T]his puts us in a hard place because I'm assuming this is the

basis of your application."  <u>See</u> Def.'s App. 12 at 45:24–25.  Along the same lines, another

commissioner observed:  "Within your application, the word 'hospital' is used over, and over,

and over, and over, and over, and over again.  But I just haven't seen any evidence of that."  <u>See</u>

Def.'s App. 12 at 59:20–23.

### E.  Members of the Community Oppose the Proposed Treatment Facility

At the hearings, members of the community voiced their opposition to the proposed

treatment facility, oftentimes using hostile, discriminatory remarks about Palm Partners' patients:

> I wouldn't feel safe walking around the neighborhood with this place here.  A
> bunch of drug addicts . . . .  You're going to tear the City down with this place.
> Why don't we propose this place over maybe in Wellington, Boca, Parkland . . . .
> Not in my backyard . . . .  Get it outta here.  Pl.'s App. Ex. C at 55:4–17 (ECF No.
> 98).

*　　　*　　　*

> The statistics prove it.  The statistics prove that people don't stay in treatment
> very long.  I worked at several facilities and they will come in for treatment after
> a couple of weeks, they decide they need a fix, they walk away.  And they get
> away no matter what.  Where do they go?  They need money to get a fix.  They go
> to the first place they can rob.  This is our neighborhood.  This is a family
> neighborhood.  Pl.'s App. Ex. C at 55:4–17.

*　　　*　　　*

> I don't need crack heads, I don't need whores, I don't need football players, I
> don't need bastards who are probably going to rape little kids being right there,
> right in our neighborhood.  Pl.'s App. Ex. D at 67:11–15 (ECF No. 98).

Outside of the hearings, other members of the community echoed these discriminatory

sentiments.  <u>See, e.g.</u>, Pl.'s App. Ex. U (ECF No. 99) ("We see it on the news, drug addicts not

even fazed by police Tasers, where they rip the leads [sic] with their bare hands . . . .  Those with severe mental disabilities are not in the right frame of mind . . . .").

### F.    Palm Partners Requests a Reasonable Accommodation

On February 17, 2014, before the City Commission rendered a decision on its conditional use application, Palm Partners requested a reasonable accommodation under the American with Disabilities Act and the Fair Housing Act.  See Pl.'s App. Ex. B (ECF No. 98).  In a letter to the Mayor of Oakland Park and the City Commission, Palm Partners requested an "accommodation to either treat the proposed use as an existing, nonconforming use in the Community Facilities [] ("CF") district or, in the alternative, grant it a conditional use as a hospital."  Id.  The letter explained that this "reasonable accommodation is entirely consistent with the prior hospital use and necessary because there is a need for more psychiatric/behavioral health facilities in the City, region and state."  Id.

### G.    The City Commission Denies Palm Partners' Conditional Use Application and Reasonable Accommodation Request

Nevertheless, on March 5, 2014, the City Commission unanimously voted to deny Palm Partners' conditional use application, thereby also rejecting its reasonable accommodation request.  See Def.'s App. 13; Reply at 8 n. 5.  Each commissioner voted to deny the application because Palm Partners failed to "establish that the proposed use was in harmony with the adjacent uses due to the fact that the proposed 300 bed psychiatric/behavioral health hospital facility was not in fact going to be operated as a hospital but rather a treatment facility."  Def.'s App. 13; see also Def.'s App. 5 ¶ 8; App. 6 ¶ 8; App. 7 ¶ 8; App. 8 ¶ 8; App. 9 ¶ 8.  In denying the application, the Commission determined that City staff had not properly reviewed the application for use of the Property as a residential treatment center.  See id.

**H.      Palm Partners Terminates Its Contract to Purchase the Property**

After the City Commission denied the application, Palm Partners terminated its contract to purchase the Property.  See Def.'s SOF ¶ 33.  Several months later, a third party agreed to purchase the Property to develop it as an assisted living facility for the elderly.  See Def.'s App. 3 ¶ 18.  Given the residential nature of the proposed use, and the fact that the Property cannot be developed for residential purposes absent an amendment to the City's Comprehensive Plan or Unified Flex Zone Map, the City has advised the subsequent purchaser on the amendment process necessary to assign residential density to the Property.  Id.

**I.      Palm Partners Sues the City**

On April 8, 2014, Palm Partners commenced this action upon the filing of a two-count Complaint alleging violations of the American with Disabilities Act and Fair Housing Act.  See Compl. ¶ 2.  The Complaint alleges that the City discriminated against Palm Partners by "[1] denying a conditional use permit to allow [it] to operate a psychiatric/behavioral health hospital facility in the City's Community Facilities zoning district, notwithstanding the City staff's determination that Plaintiff's application met the requirements of the City's Zoning and Landscaping codes, as well as the requirements for consideration by the City Commission as a Conditional Use; [2] denying [Palm Partners'] request for a reasonable accommodation to either treat the proposed use as an existing, nonconforming use in the Community Facilities district or, alternatively, grant [it] a Conditional Use as a hospital; and [3] refusing to allow Palm Partners to make an oral request for reasonable accommodation that it be treated as the functional equivalent [of] a hospital when the City Commission questioned whether Plaintiff met the City's definition of "Hospital" since it would not initially be licensed as such (as the City has no definition of "Hospital" in its zoning code).  Id.  In all, the Complaint asserts claims under the American with

Disabilities Act and Fair Housing Act for (1) disparate treatment (intentional discrimination) and (2) failure to make a reasonable accommodation.

The City now moves for summary judgment on Palm Partners claims.

## II.    LEGAL STANDARD

Summary judgment is appropriate where there is "no genuine issue as to any material fact [such] that the moving party is entitled to judgment as a matter of law." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); see also Fed R. Civ. P. 56.  An issue of fact is "material" if it is a legal element of the claim under the applicable substantive law which might affect the outcome of the case. Allen v. Tyson Foods, Inc., 121 F.3d 642, 646 (11th Cir. 1997).  It is "genuine" if the record, taken as a whole, could lead a rational trier of fact to find for the non-moving party.  Id.

The moving party has the initial burden of showing the absence of a genuine issue as to any material fact.  Id. (citiation omitted).  In deciding whether the moving party has met this burden, the court must view the movant's evidence and all factual inferences arising from it in the light most favorable to the non-moving party.  Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1115 (11th Cir. 1993).  Once the moving party satisfies its initial burden, the burden shifts to the non-moving party to come forward with evidence showing a genuine issue of material fact that precludes summary judgment.  Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991); see also Fed. R. Civ. P. 56(e).  "The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986).  "If reasonable minds could differ on the inferences arising from undisputed facts, then a court should deny summary judgment." Tyson Foods, Inc., 121 F.3d at 646 (citations omitted).  But if the record, taken as a whole, cannot lead a rational trier of fact to find for the

non-moving party, there is no genuine issue for trial, and summary judgment is proper.

Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

## III.   DISCUSSION

The City's Motion for Summary Judgment presents two issues.  First, whether a rational trier of fact could find that the City intentionally discriminated against Palm Partners in denying its conditional use application.  Second, whether a rational trier of fact could find that it would be a reasonable accommodation to treat Palm Partners' proposed treatment facility as an existing, non-conforming use in the City's Community Facilities district, or, alternatively, to approve it for conditional use as a hospital.  Based on the evidence before it, the Court finds that no rational fact-finder could conclude that discriminatory animus was behind the City's decision to deny Palm Partners' application, or that its accommodation request is reasonable.  Accordingly, there is no genuine issue for trial, and the City is entitled to summary judgment.

### A.   Legal Framework

The American with Disabilities Act, as amended by the ADA Amendments Act of 2008, 42 U.S.C. § 12101 et seq. (the "ADA"), prohibits discrimination based on disability[2] in programs, services, and activities provided or made available by public entities.  Likewise, the Fair Housing Act of 1968, as amended by the Fair Housing Amendment Act of 1988, 42 U.S.C. § 3061 et seq. (the "FHA"), prohibits discrimination in the sale, rental, and financing of

---

[2] Federal law defines a "disability" as "(1) a physical or mental impairment which substantially limits one or more of such person's major life activities, (2) a record of having such an impairment, or (3) being regarded as having such an impairment, but such term does not include current, illegal use of or addiction to a controlled substance (as defined in section 802 of Title 21)."  42 U.S.C. § 3602(h).  The term "physical or mental impairment," in turn, includes drug addiction (other than addition caused by current, illegal use of a controlled substance) and alcoholism.  See 24 C.F.R. § 100.201(a)(2).  For purposes of summary judgment, the City concedes that Palm Partners' future residents are disabled under federal law, although the City does not waive its ability to challenge that characterization at a later time.  See Motion at 6 n.3.

dwellings, and in other housing-related transactions, based on disability.  A plaintiff can bring a

discrimination claim under either statute for disparate treatment (discriminatory intent) or

disparate impact (discriminatory effect).[3]  See Schwarz v. City of Treasure Island, 544 F.3d

1201, 1212 (11th Cir. 2008).  Even in the absence of discriminatory intent or effect, however, a

defendant will be liable under the ADA and FHA for failure to make a reasonable

accommodation in rules, policies, practices, or services, when such accommodation is necessary

to afford a disabled person access to basic goods and services," see 42 U.S.C. § 12182(b)(2)(A)(ii),

or when such accommodation may be necessary "to afford a disabled person equal opportunity to

use and enjoy a dwelling," see 42 U.S.C. § 3604(f)(3)(B).  Both laws apply to municipal zoning

decisions.[4]  See, e.g., Caron Found. of Florida, Inc. v. City of Delray Beach, 879 F. Supp. 2d

1353, 1364 (S.D. Fla. 2012) (citations omitted).

### B.    The Evidence Fails to Establish Intentional Discrimination

The Court finds that the evidence does not support Palm Partners' intentional

discrimination claims.  To prove that a zoning decision was based on intentional discrimination,

the plaintiff must show that the defendant in fact intended to discriminate or was improperly

motivated in making the discriminatory decision.  Bonasera v. City of Norcross, 342 F. App'x

---

[3] The United States Supreme Court has explained the difference between these two theories as follows:  "'Disparate treatment' . . . is the most easily understood type of discrimination.  The employer simply treats some people less favorably than others because of their race, color, religion, sex, or national origin.  Proof of discriminatory motive is critical, although it can in some situations be inferred from the mere fact of differences in treatment."  Int'l Bhd. of Teamsters v. United States, 431 U.S. 324, 335 n.15 (1977).  "Disparate impact," on the other hand, concerns "employment practices that are facially neutral in their treatment of different groups but that in fact fall more harshly on one group than another and cannot be justified by business necessity."  Id.  (internal citations omitted).

[4] Because courts often analyze claims brought under the ADA and FHA in tandem due to their similarities, see, e.g., United States v. Hialeah Hous. Auth., 418 F. App'x 872, 876 (11th Cir. 2011), the Court will not differentiate between the two statutes in the cases cited, unless that distinction is relevant.

581, 584 (11th Cir. 2009).  A plaintiff may establish discriminatory intent through either direct or

circumstantial evidence.  Caron Found. of Florida, Inc., 879 F. Supp. 2d at 1368 (citing Vill. of

Arlington Heights v. Metro. Hous. Dev. Corp., 429 U.S. 252 (1977)).  If the plaintiff establishes

intentional discrimination through direct evidence, the inquiry ends there, and the plaintiff is

entitled to relief.  See, e.g., Massaro v. Mainlands Section 1 & 2 Civic Ass'n, Inc., 3 F.3d 1472,

1476 n.6 (11th Cir. 1993).  But rarely will a case be made out on the basis of direct evidence.

See, e.g., U.S. v. Badgett, 976 F.2d 1176, 1178 (8th Cir. 1992).  In the absence of direct

evidence, the plaintiff must establish intentional discrimination through circumstantial evidence.

Here, Palm Partners fails to establish intentional discrimination through either direct or indirect

evidence.

### 1.   No Direct Evidence of Intentional Discrimination

The Court finds no direct evidence showing that the City intentionally discriminated

against Palm Partners in denying its application.  To the contrary, the direct evidence strongly

suggests that discriminatory animus played no role in the City Commission's decision.  In its

order, the Commission stated that it denied the application because Palm Partners failed to

"establish that the proposed use was in harmony with the adjacent uses due to the fact that the

proposed 300 bed psychiatric/behavioral health hospital facility was not in fact going to be

operated as a hospital but rather a treatment facility."  This rationale is consistent with the

hearing transcripts, which show the Commission's concern over the residential nature of the

proposed treatment facility, particularly in light of Palm Partners' representations that it intended

to develop the Property as a hospital.  Tellingly, Palm Partners cites not one discriminatory

remark or statement made by any member of the Commission as direct evidence of

discrimination.[5]  The Court is thus satisfied that the City Commission denied Palm Partners'
application for the non-discriminatory reason that the proposed facility would not be operated as
a hospital, as stated on the application, but rather as a residential treatment center.

The Court rejects the argument that the City's vote to deny the application
"notwithstanding the finding of City staff that Palm Partners' proposed redevelopment and use of
the property met the City's criteria for conditional use, concurrency and consistency," coupled
with the public's vociferous opposition to the proposed facility, "constitutes direct evidence of
discrimination."  See Response at 7.  To begin with, Palm Partners' reliance on the City staff's
findings is misplaced.  On its application, Palm Partners stated that it intended to develop the
Property as a hospital, even though it really meant to develop the property as a residential
treatment center.  Based on Palm Partners' representations, City staff analyzed the application
for hospital use only.  Given that Palm Partners' actual plans for the Property did not come to
light until the City Commission hearings, the City staff's findings did not account for residential
use of the Property.  In the end, the City staff's analysis was premised on a material
misrepresentation, and the Court dismisses Palm Partners' underhanded attempt to rely on a
falsehood in support of its case.

In addition, there is nothing to suggest that the community's hostile opposition to the
treatment facility in any way informed the Commission's decision.  A plaintiff may demonstrate

---

[5] In support of its intentional discrimination claims, Palm Partners cites the following remark
made by one of the commissioners:  "And I have to say, on behalf of my colleagues and on
behalf of the City of Oakland Park, I found [the letter requesting a reasonable accommodation]
very offensive."  Response at 20 (citing Pl.'s App. Ex. E at 64:13–15).  Conveniently, however,
Palm Partners fails to include the context to this statement, which makes clear that what the
commissioner found offensive was not the request for a reasonable accommodation, but rather
Palm Partners' suggestion in the request that "any decision [the Commission makes] . . . in
opposition, or that did not support approving this use was based in discrimination."  Pl.'s App.
Ex. E at 64:13–15.  This is not the only instance where Palm Partners misstates the record for its
ends.

intentional discrimination if the "decision-making body acted for the sole purpose of effectuating the desires of private citizens, that [discriminatory] considerations were a motivating factor behind those desires, and that members of the decision-making body were aware of the motivations of the private citizens." Hallmark Developers, Inc. v. Fulton Cnty., Ga., 466 F.3d 1276, 1283–84 (11th Cir. 2006) (citations omitted).  While the City Commission may have been aware of the discriminatory desires of certain members of the community, the record does not show the Commission acting for the sole purpose of effectuating those desires.  Rather, the record demonstrates that the Commission denied the application after it learned of the residential nature of the proposed treatment facility.  The only evidence Palm Partners offers in support of this position is the public opposition at the hearings.  But mere public opposition, without more, is not enough to establish discriminatory intent on the part of a decision-making body.[6]

### 2.   No Circumstantial Evidence of Intentional Discrimination

The Court also finds that Palm Partners fails to prove intentional discrimination through circumstantial evidence.  Claims of intentional discrimination based on circumstantial evidence are analyzed using the burden-shifting framework set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).  See, e.g., Holly v. Clairson Indus., L.L.C., 492 F.3d 1247, 1255 (11th Cir. 2007) (citation omitted); Sec'y U.S. Dep't of Hous. & Urban Dev., on Behalf of Herron v. Blackwell, 908 F.2d 864, 870–71 (11th Cir. 1990).  Under that framework, "[f]irst, the plaintiff has the burden of proving a prima facie case of discrimination by a preponderance of the evidence.  Second, if the plaintiff sufficiently establishes a prima facie case, the burden shifts to the defendant to articulate some legitimate, nondiscriminatory reason for its action.  Third, if the

---

[6] Palm Partners' argument also fallaciously assumes that the City Commission had to adopt the City staff's recommendation.  Under Palm Partners' reasoning, if City staff errs in analyzing a zoning application, the Commission must compound the error by adopting the staff's recommendation.  Palm Partners offers no legal or factual support for this proposition.

defendant satisfies this burden, the plaintiff has the opportunity to prove by a preponderance [of the evidence] that the legitimate reasons asserted by the defendant are in fact mere pretext." Blackwell, 908 F.2d at 870.  Among the factors courts consider in determining whether discriminatory intent is present are: (1) the discriminatory effect of the decision, (2) the historical background of the decision, (3) the sequence of events leading up to the challenged decision, (4) any departure from normal procedural or substantive criteria, and (5) relevant legislative or administrative history.  See, e.g., Vill. of Arlington Heights, 429 U.S. at 267–68.

Applying these factors, the Court finds that Palm Partners fails to establish a prima facie case of intentional discrimination.  First, there is no indication that the City's decision to deny the application had a discriminatory effect.  Palm Partners offers no evidence whatsoever of the decision's effect.  The record is devoid of statistics, data, or other helpful information showing any sort of disparate effect.  If anything, the City's even-handed treatment of the disabled and non-disabled when it comes to residential use of the Property, as evidenced by its interactions with the Property's subsequent purchaser, strongly suggest that the City's decision has not had a discriminatory effect.  The Court is simply unable able to find any evidence that the City's decision bears more heavily on the disabled than the non-disabled.  See id. at 266 (quotation omitted).

Second, the decision's historical background does not reveal a series of official acts taken for invidious purposes.  Palm Partners does not cite any other instance where the City has made a zoning decision adversely affecting people with disabilities, let alone another occasion where the City denied a conditional use application to disabled people.  As a matter of fact, the City permits residential treatment centers, like the one here, in its residential zoning districts, and the City has a number of group and community residential homes for people with disabilities.  Def.'s

14

SOF ¶ 31.  The Court finds no reason to question the City's decision based on its historical

background.

Third, nothing in the sequence of events leading up to the decision suggests

discriminatory intent.  The City did not re-zone the Property to remove residential density upon

learning of Palm Partners' agreement to purchase the Property.  See Vill. of Arlington Heights,

429 U.S. at 267.  Nor did the City revise its zoning ordinances to prevent Palm Partners from

operating the proposed facility in response to public opposition.  See Caron Found. of Florida,

Inc., 879 F. Supp. 2d at 1369.  To be sure, the legal constraints on Palm Partners' proposed

residential use of the Property were in place before it contracted to purchase the Property.

Motion at 9.  The Court is unable to infer discriminatory intent from the sequence of events

leading up to the City's denial of the application.

The Court is unpersuaded that the City's changing of rationales for denying the

application following hostile public opposition is evidence of discrimination.  See Response at

11–12.  Palm Partners points to the fact that in its written order, the City denied the application

because the proposed facility would be used for residential treatment.  Id. at 11.  Then, after

Palm Partners filed suit, the City changed its reason for denying the application, claiming that the

proposed use was "special residential."  Id.  But the cases Palm Partners cites in support of this

argument are inapposite.[7]  Contrary to Palm Partners' characterization, the sequences of events

in those cases were suspect not because they involved a mere change in rationale, but because

they involved a departure from the initial official decision.  Here, by contrast, even if the City

changed its rationale for denying the application, it remained consistent in its ultimate decision to

---

[7] Palm Partners cites Resident Advisory Board v. Rizzo, 564 F.2d 126, 143 (3d Cir. 1977), and
Fowler v. Borough of Westville, 97 F. Supp. 2d 602, 613 (D.N.J. 2000).  See Response at 11–12.
Besides their factual differences, these cases are also not binding on this Court.

deny the application.  In that respect, the circumstantial evidence of discrimination in the cases cited by Palm Partners was stronger than it is here, and the Court finds their invocation unpersuasive.

Fourth, the evidence does not demonstrate that the City deviated from its normal procedural or substantive criteria in rendering its decision.  Palm Partners claims that at the February 19 hearing, the City closed the record, but then re-opened it at the March 5 hearing.  Id. at 12.  Palm Partners, however, does not provide a single record cite for this claim, nor does it explain how this would constitute a deviation from the City's normal procedures.  The City actually seems to have accommodated Palm Partners by giving its representatives additional time to prepare and present the application.[8]  See Def.'s App. 11 at 169:4-170:13.  If the City departed from its normal procedure, it seems to have been to accommodate Palm Partners, not to discriminate against it.  Similarly, Palm Partners fails to show that any substantive criteria typically considered important by the City Commission strongly favors approval of the application.  See Caron Found. of Florida, Inc., 879 F. Supp. 2d at 1370 (citing Vill. of Arlington Heights, 429 U.S. at 267).  The Court finds no indication that the Commission deviated from its normal procedural or substantive criteria in denying the application.

Lastly, nothing in the relevant legislative or administrative history suggests discriminatory animus on the City's part.  "The legislative or administrative history may be highly relevant, especially where there are contemporary statements by members of the decisionmaking body, minutes of its meetings, or reports."  Vill. of Arlington Heights, 429 U.S. at 268.  In this case, however, Palm Partners does not offer a single contemporaneous statement

---

[8] At the conclusion of the first hearing, the City Commission asked Palm Partners' representatives to come prepared to the second hearing because their answers until that point had been inconsistent.  See Def.'s App. 11 at 169:4–170:13.

or action by any member of the City commission revealing discriminatory motive.  Still, Palm

Partners points to the absence of a statutory definition for the word "hospital" in the City's

zoning laws as evidence of intentional discrimination.  It claims that this absence allows the City

to approve hospitals for patients who are not disabled and to prohibit the functional equivalent

for people with substance abuse disabilities.[9]  See Response at 9.  This position is unavailing.

While "hospital" may not be defined in the City's land use laws, it is defined in the Florida

Statutes.  See Fla. Stat. § 395.002(12).  And even if it were not, it is a basic principle of statutory

interpretation that a statutorily undefined term is given its ordinary meaning.  See, e.g., Miami

Beach v. Royal Castle Sys., Inc., 126 So. 2d 595, 597–98 (assigning the term "restaurant" its

ordinary meaning because the term was not defined by the city's zoning code).  Palm Partners

offers no evidence remotely suggesting that the City has ever exploited this absence of a

statutory definition, or the absence of any statutory definition for that matter, for invidious ends.

At any rate, this argument is nothing more than a straw man that distracts from the residential

nature of the proposed facility.  The overwhelming weight of the evidence shows that the

Commission denied the application because Palm Partners sought to use the Property as a

residential treatment center, not a hospital.  The Court finds no basis for Palm Partners'

discrimination claims in the relevant legislative or administrative history.

  In view of these factors, the Court finds that Palm Partners fails to establish a prima facie

case of intentional discrimination.  The Court finds no reason to suspect that discriminatory

animus informed or motivated the City Commission's decision to deny the conditional use

---

[9] Palm Partners argues that the proposed facility is the functional equivalent of a hospital because "it would have beds, physicians, nurses, psychologists, and 24-hour care, and is required to obtain licensure to provide medical and other treatment."  Response at 9–10.

application.  Therefore, the City is entitled to judgment as a matter of law on Palm Partners

intentional discrimination claims.[10]

> **C.**     **The Evidence Fails to Establish That Palm Partners' Accommodation**
> **Request Is Reasonable**

Palm Partners' reasonable accommodation claims also fail as a matter of law.[11]  An

"[a]ccommodation is not reasonable if it either [1] imposes undue financial and administrative

burdens on a grantee or [2] requires a fundamental alteration in the nature of the program."[12]

Schwarz v. City of Treasure Island, 544 F.3d 1201, 1220 (11th Cir. 2008).  A proposed

accommodation amounts to a "fundamental alteration" if it would eliminate an "essential" aspect

of the relevant activity.  Id.  In the land use context, whether a particular rule is "essential" to a

zoning scheme depends on the facts of each case.  Id. at 1221.  Nevertheless, the United States

Court of Appeals for the Eleventh Circuit has identified a few general principles to guide courts

in determining the reasonableness of a request that asks a local government to bend or alter a

zoning law to accommodate the disabled:

---

[10] Given this absence of any credible evidence, the Court also rejects Palm Partners' contention
that, "at a minimum, the vote to deny, following vocal and hostile opposition, constitutes a
disputed issue of fact as to intentional discrimination."  Response at 8.  On a motion for
summary judgment, the non-moving party bears the burden of asserting "specific facts showing
that there is a genuine issue for trial."  Fed. R. Civ. P. 56(e).  Here, the Court is hard-pressed to
find any direct or indirect evidence of discrimination by the City.  So, while the issue of whether
the City discriminated against Palm Partners is certainly material, it is not genuine.  Therefore,
the City is entitled to judgment as a matter of law on Palm Partners' intentional discrimination
claims.

[11] Like intentional discrimination claims, courts analyze reasonable accommodation claims under
the FHA and ADA in tandem.  See 10th St. Partners, LLC v. Cnty. Comm'n ex rel. Sarasota
Cnty., Fla., No. 8:11-CV-2362-T-33TGW, 2012 WL 4328655, at *4 (M.D. Fla. Sept. 20, 2012);
see also United States v. Hialeah Hous. Auth., 418 F. App'x 872, 876 (11th Cir. 2011).  Thus, as
in its discussion of Palm Partners' intentional discrimination claims, the Court will not
differentiate between the two statutes in the cases cited, unless that distinction is relevant.

[12] The City only argues that Palm Partners' accommodation request is not reasonable because it
would fundamentally alter its zoning scheme.  See Motion at 16.

The basic purpose of zoning is to bring complementary land uses together, while separating incompatible ones.  Thus, ordering a municipality to waive a zoning rule ordinarily would cause a "fundamental alteration" of its zoning scheme if the proposed use was incompatible with surrounding land uses.  On the other hand, if the proposed use is quite similar to surrounding uses expressly permitted by the zoning code, it will be more difficult to show that a waiver of the rule would cause a "fundamental alteration" of the zoning scheme.  Similarly, if the municipality routinely waives the rule upon request, it will be harder to show that the rule is "essential."

Id.

So, for example, in Schwartz, a Florida city cited the operator of six halfway houses for violating a zoning ordinance limiting occupancy turnover.  Id. at 1205.  The operator sued the city alleging, among other things, that enforcement of the occupancy-turnover rule against the halfway houses amounted to disparate treatment, disparate impact, and a failure to reasonably accommodate the disabled under the ADA and FHA.  Id.  On appeal, the Eleventh Circuit held that requiring the city to relax the rule to accommodate two of the six halfway houses, each located in zones permitting only single-family dwellings and prohibiting tourist dwellings, would not be a reasonable accommodation.  Id. at 1223.  Given the incompatibility between the high turnover in the two houses and the surrounding land uses, the court determined that the occupancy-turnover rule was essential to this zoning district.  Id.  For that reason, the court concluded that relaxing the rule in this zoning district to accommodate the two houses would amount to a "fundamental alteration" of the city's zoning scheme.  Id.  At the same time, the Schwartz court held that allowing the other four halfway houses in zones already permitting unlimited turnover in multi-family dwellings would be a reasonable accommodation.  Id. at 1223-25.  Unlike the other two houses, these four were compatible with the surrounding land uses, as the operator "[sought] only to use [them] in the same manner as it could use an apartment building next door."  Id. at 1225.  Given that the occupancy-turnover rule was not

essential to this zoning district, the court concluded that relaxing the rule to accommodate these four houses would not constitute a "fundamental alteration" of the city's zoning scheme. Id.

With these principles in mind, the Court finds that Palm Partners' requested accommodation is not reasonable. The rule prohibiting residential use of property bearing a non-residential zoning designation and demarcated as a non-receiving site for the allocation of residential reserve and flexibility units is essential to the City's zoning scheme. Like the two halfway houses in Schwartz, Palm Partners' proposed treatment facility is incompatible with the Property's surrounding land uses. The Property is bounded by a railway and an industrial warehouse to the east, medical offices to south, a vacant lot and property zoned for single-family residential use to the north, and property zoned for single-family residential (future commercial) use to the west. And there is no evidence that the City has relaxed this rule in the past, let alone that it "routinely waives [it] upon request." Id. at 1221. On that basis, the rule is essential to the City's zoning scheme, and the Court finds that requiring the City to waive it to accommodate Palm Partners' proposed treatment facility would amount to a fundamental alteration of the City's zoning scheme. Palm Partners accommodation request is therefore not reasonable.

That the City itself views the rule as essential is significant. While by no means dispositive, this Court must accord a measure of deference to the City's views of its own land use regulation in determining the reasonableness of a requested accommodation. See id. at 1223. As noted earlier, the City Commission is unable to change the Property's zoning designation or allocate residential density to the Property without amendment to the City's land use code. Because not even the local officials empowered to grant conditional use approval have enough authority to allow residential use of the Property, it is fair to say that the City views this rule as

essential to its zoning scheme.  <u>See</u> <u>id.</u> at 1222–23.  The Court thus gives deference to the City's views in its analysis.

The Court rejects the idea that the proposed treatment facility could be granted conditional use as a hospital.  Palm Partners argues that the proposed facility is the "functional equivalent of a hospital because it would have beds, physicians, nurses, psychologists, and 24-hour care, and is required to obtain licensure to provide medical and other treatment."  Response at 9–10.  A "hospital" is an establishment that "(a) [o]ffers services more intensive than those required for room, board, personal services, and general nursing care, and offers facilities and beds for use beyond 24 hours by individuals requiring diagnosis, treatment, or care for illness, injury, deformity, infirmity, abnormality, disease, or pregnancy; and (b) [r]egularly makes available at least clinical laboratory services, diagnostic X-ray services, and treatment facilities for surgery or obstetrical care, or other definitive medical treatment of similar extent . . . ."  Fla. Stat. § 395.002(12).  Based on this definition, Palm Partners' proposed facility is a hospital only in the most abstract sense.  The facility would not offer the sort of "definitive medical treatment" characteristic of a hospital.  It would not provide clinical laboratory services, diagnostic X-ray services, and treatment facilities for surgery or obstetrical care.  Rather, the proposed facility would function primarily to provide residential treatment for patients staying at the facility for one to three months or even longer.  An accommodation request that asks a local government to suspend disbelief cannot be reasonable.[13]

The Court also rejects the idea that the proposed facility could be treated as an existing, non-conforming use in the City's Community Facilities district.  "[A] non-conforming use is a

---

[13] It is also worth mentioning that the proposed facility would not be licensed as a hospital, which, under Florida law, is required to operate a hospital.  <u>See</u> Fla. Stat. § 395.003(1)(a).  This only highlights how unrealistic Palm Partners' position is.

land use that is impermissible under current zoning restrictions but that is allowed because the use existed lawfully before the restrictions took effect."  Rollison v. City of Key West, 875 So. 2d 659, 660 (Fla. Dist. Ct. App. 2004) (citation omitted).  Palm Partners, though, has made no showing that the Property has ever been lawfully developed for the type of use it proposes.  The hospital that existed on the property before was a 396-bed acute care general hospital, not a residential treatment center for recovering substance abusers.  Def.'s SOF ¶ 2.  Because use of the Property as a residential treatment center is impermissible under past and current zoning law, it cannot be treated as an existing, non-conforming use, and it would be unreasonable to require the City to treat it as such.

Ultimately, Palm Partners' accommodation request is not reasonable because it violates the "equal opportunity" requirement at the heart of the reasonable accommodation provisions of the ADA and FHA.  "[T]he 'equal opportunity' requirement mandates not only the level of benefit that must be sought by a reasonable accommodation but also provides a limitation on what is required.  The [ADA and] FHA [do] not require accommodations that increase a benefit to a handicapped person above that provided to a nonhandicapped person with respect to matters unrelated to the handicap."  Bryant Woods, Inn, Inc. v. Howard Cnty., Maryland, 124 F. 3d 597, 604 (4th Cir. 1997); see also Raetano v. Kally K's, Inc., No. 808-CV-02104-EAK-TGW, 2009 WL 651808, at *2 (M.D. Fla. Mar. 12, 2009) ("The specific purpose of the ADA is to provide equal opportunities for individuals with disabilities.").  Preferential treatment is not required. Philippeaux v. Apartment Inv. & Mgmt. Co., No. 14-11156, 2015 WL 179023, at *3 (11th Cir. Jan. 15, 2015).  In this case, the Property is unable to support residential use in any way absent amendment to the City's zoning regulations, and so non-disabled individuals have no greater opportunity to residential use of the Property than disabled individuals.  Because equal

opportunity is all the law requires, the City was under no obligation to give Palm Partners preferential treatment.

Given these points, the Court finds that Palm Partners' accommodation request is not reasonable. The rule barring residential development of property zoned for non-residential use and designated a non-receiving site for the allocation of residential reserve and flexibility units is essential to the City's zoning scheme. For that reason, requiring the City to waive it to accommodate the proposed treatment facility would fundamentally alter its zoning scheme. The Court rejects as untenable Palm Partners' position that the property could be granted conditional use as a hospital, or that it could be treated as an existing, non-conforming use in the City's Community Facilities district. All in all, non-disabled individuals have no greater opportunity to residential use of the Property than disabled individuals, and the City is under no obligation to give Palm Partners preferential treatment in the application of its zoning code. Accordingly, the City is entitled to judgment as a matter of law on Palm Partners' reasonable accommodation claims.

## IV.    CONCLUSION

For the foregoing reasons, it is hereby ORDERED AND ADJUDGED that Defendant City of Oakland Park's Motion for Summary Judgment is GRANTED.

All other pending motions are DENIED AS MOOT. The Clerk of Court is instructed to CLOSE this case.

DONE AND ORDERED in Chambers at Miami, Florida, this 29th day of April, 2015.

_____
K. MICHAEL MOORE
CHIEF UNITED STATES DISTRICT JUDGE

cc:      All counsel of record